UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

SYAMALA RAO CHAPALA,
                    Plaintiff

v.

INTERFAITH MEDICAL CENTER,
KATHLEEN KUCK, and
ERIC JAFFE
                    Defendants.

No. 04 CV 3458 (JBW)

MEMORANDUM & ORDER

---

Appearances:

For Plaintiff:

    Anthony C. Ofodile, Esq.
    498 Atlantic Avenue
    Brooklyn, NY 11217

For Defendants:

    Dean Silverberg
    Robyn Ruderman
    250 Park Avenue
    New York, NY 10177

JACK B. WEINSTEIN, Senior District Judge:

**Table of Contents**

I.     Introduction

II.    Jurisdiction

III.   Facts and Procedural History

IV.   Law

        A.     Standard of Review

        B.     Employment Discrimination Law



       1.      Prima Facie Evidence

       2.      Evidence of Overt Discrimination

V.    Application of Law to Facts

    A.    Plaintiff's Claim Regarding Her Rejection for Residency

    B.    Plaintiff's Claim Regarding Interfaith's Failure to Hire or Recall Her from Layoff for an Opening in the Quality Assurance Department

    VI.   Conclusion

## I. Introduction

Symala Rao Chapala brings suit under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; New York State Human Rights Law, Executive Law § 296; and New York City Human Rights Law, Administrative Code § 8, et seq. She claims that her multiple applications for a medical residency at defendant Interfaith Medical Center (IMC) were rejected on the basis of her age; that because of her age and national origin she was not rehired after being laid off, when a position became available; and that she was overlooked for another position because of her gender.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the grounds that plaintiff's claims regarding rejection for medical residency are substantiated only by evidence barred as hearsay; that defendant can present irrefutable evidence supporting merit- and skill-related reasons for not hiring or accepting plaintiff for any of the positions to which she claims to be entitled; that plaintiff was neither qualified for nor

2

actually applied for the two non-residency positions in question; and that defendant had no legal or contractual obligation to call plaintiff back after laying her off.

Plaintiff has met her burden of production on her claim of age discrimination. With regard to her claims of discrimination on the basis of age and national origin involving defendant's failure to rehire her for the same position from which defendant had laid her off, plaintiff has met the burden of production—she has presented a prima facie case supporting an inference of discrimination, and a reasonable jury might possibly find pretextual defendant's claim that the position for which plaintiff was not rehired was materially changed from the position from which plaintiff had been laid off. With regard to plaintiff's claims of age and gender discrimination involving defendant's failure to hire her for the position of Assistant Vice President of Clinical Services, plaintiff has voluntarily dismissed this claim.

## II. Jurisdiction

Under Fed. R. Civ. P. 4(m), a party must serve a summons and complaint on each named defendant within 120 days from the filing of the complaint. If the party fails to meet this requirement, a court must dismiss the action unless the party shows good cause for their failure. *See Malone v. City of New York*, 2005 WL 1892019 (E.D.N.Y. 2005)

On or around August 10, 2004, plaintiff served IMC with one copy of the Summons and Complaint. Plaintiff however did not serve the individually named defendants, Dr. Eric Jaffe and Ms. Kathleen Kuck with copies of these documents. Ruderman Aff. ¶ 5, Ex. B. IMC answered the complaint on September 22, 2004, asserting as an affirmative defense that the Court lacked personal jurisdiction over Dr. Jaffe and Ms. Kuck because plaintiff failed to serve them with a summons and complaint. Ruderman Aff. ¶ 6, Ex. C.

By stipulation dated October 14, 2004, counsel for IMC agreed to allow plaintiff to amend her complaint without leave of the court. Ruderman Aff. ¶ 7, Ex. D. On November 9, 2004, plaintiff served IMC's counsel with a copy of the amended complaint. Ruderman Aff. ¶ 8, Ex. E. Counsel for IMC never agreed to accept service for Dr. Jaffe or Ms. Kuck and neither Dr. Jaffe nor Ms. Kuck was served with the amended complaint. Ruderman Aff. ¶ 8. While both individually named defendants answered the amended complaint, they maintained the position that they were never properly served and expressly stated that they were not waiving any rights or defenses arising from the lack of service. Ruderman Aff ¶ 9, Ex. F. At no time after the individually named defendants filed their answers did the plaintiff attempt to personally serve Dr. Jaffe or Ms. Kuck. The plaintiff never responded in any way to the individually named defendants' assertion of this affirmative defense. Ruderman Aff. ¶ 10.

This Court lacks personal jurisdiction over the two individually named defendants, Dr. Jaffe and Ms. Kuck, due to plaintiff's failure to properly serve them. Any complaint served by plaintiff against Dr. Jaffe and Ms. Kuck now would be barred by the applicable statute of limitations. Accordingly, the amended complaint against Dr. Jaffe and Ms. Kuck is dismissed without prejudice.

### III. Facts and Procedural History

Plaintiff is a fifty-six-year-old woman of Indian origin, who came to the United States in 1992. Pl.'s Aff. ¶ 2. Having obtained her medical degree from Sri Venkateswara University in 1978 and practiced medicine in India for fourteen years, she planned, upon arrival in the United States, to apply for certification to practice medicine here. Pl.'s Aff. ¶ 5.

In June 1994, shortly after taking Step I of the United States Medical Licensing Examination (USMLE), plaintiff was employed as a "Quality Assurance Assistant" (QAA) by defendant. Pl.'s Dep. 142-143; Kuck T. 18-19. Her duties as a QAA included reviewing patient charts and medical records, and providing data to physicians and department heads. Pl.'s Dep. 144-45; Kuck T. 12, 41. In December 1994, plaintiff resigned from IMC to study and sit for Step II of the USMLE. Pl.'s Dep. 142-43. She took the test in August 1995 and returned to her job at IMC in September 1995, in the belief that working at IMC in any capacity would increase her chances of obtaining a medical residency there. Pl.'s Dep. 143-44. In December 1996, plaintiff volunteered to be laid off, to protect a pregnant friend and co-worker who was in danger of being discharged and losing health insurance for the delivery of her baby. Pl.'s Dep. 43-44.

Before she left, plaintiff submitted her first application for medical residency at IMC. Pl.'s Dep. 43-46. Over the next several years, she continued to submit applications. She was never given any of the 25-28 residency positions the hospital grants each year. Jaffe T. 13, 31.

Five years after she was laid off, in January 2001, Virginia Baron, plaintiff's former supervisor in the Quality Assurance Department, called and informed her of an opening in the department. Plaintiff returned to her job as a QAA in the hope that employment at IMC would help her obtain a residency. Pl.'s Dep. 47-48. She submitted an application for a residency in 2001, but was not accepted. In February 2002, she was again laid off, this time involuntarily, due to IMC's fiscal problems. Pl.'s Dep. 91, 105, 154; Baron T. 14. She submitted an application for a residency in 2002, and another in 2003.

According to plaintiff, after she was rejected for residency in 2003, she wrote to Dr. Osama Badran, then chair of the OB/GYN department at IMC, asking him to speak to defendant, Dr. Eric Jaffe, chair of the Department of Medicine and program director of the Internal

5

Medicine Residency Program, on her behalf. Pl.'s Dep. 97-98; Pl.'s Aff. ¶ 21. Badran had worked with plaintiff in her capacity as a QAA. Badran Aff. ¶ 3. Plaintiff claims that Dr. Badran called her at home at the end of October 2003 and told her that he had spoken with Dr. Jaffe, and that Dr. Jaffe had told Dr. Badran that he would not select plaintiff for residency because she was "too old to do first-year residency." Pl.'s Dep. 98-99, 101; Pl.'s Aff. ¶ 21; Rao Aff. ¶¶ 1-3. Shortly thereafter, plaintiff called Virginia Baron, her former supervisor in the Quality Assurance Department, who had previously agreed to speak with Dr. Jaffe on plaintiff's behalf. Pl.'s Aff. ¶ 22; Baron Dep. 10: 6-9. According to plaintiff, Ms. Baron told her that she too had spoken with Dr. Jaffe and that he had told her plaintiff was "too old" for a residency. Pl.'s Dep. 101-104, 212; Pl.'s Aff. ¶ 22; Rao Aff. ¶¶ 4-6.

Defendants deny that either of these conversations took place. Dr. Badran has produced an affidavit denying having discussed plaintiff's residency application with Dr. Jaffe Badran, *see* Badran Aff.¶ 6, and Ms. Baron denies that Dr. Jaffe said, or that she repeated, the statements in question, though she does not deny having spoken with Dr. Jaffe on plaintiff's behalf, or having spoken with plaintiff about the subject. Baron Aff. ¶¶ 3-4.

In June 2003, Virginia Baron resigned from the Quality Assurance Department, and the one QAA who remained after the 2002 layoffs was promoted to director of the department. Baron T. 31-32. Although plaintiff had expressed a desire to return to her old job as recently as April 2003, *see* Pl.'s Aff. ¶ 25; Ofodile Aff., Ex. 34, IMC instead hired an outsider, Amelia Arca-Quinto, a young Filipino woman, for the position. Ofodile Aff. Ex. 36; Co Aff. ¶ 7-8. Both Virginia Baron and her successor, Noella Co, are also Filipino. Pl.'s Aff. ¶ 26; Def.'s Mem. July of 19, 2006, 38.

While defendants assert that the position for which they hired Ms. Quinto was materially different from the position plaintiff left, *see* Co Aff. ¶ 8, the official job descriptions are nearly identical. Ofodile Aff., Exs. 11, 37. See Appendices A and B, attached. The "Job Summary" from the 1994 description for "Q.A. Assistant" reads: "Serves as liaison between hospital Quality Assessment & Improvement program and medical staff departmental peer review committee. Conducts initial medical records review for departmental Quality Assessment & Improvement Indicators." Odofile Aff., Ex. 11. The "Position Summary" in the 2004 version reads: "To serve as a liaison between the Quality Assessment and Improvement program and medical staff department peer review committee. To conduct initial medical records review for departmental quality assessment and improvement indicators." Odofile Aff., Ex. 37. Whereas the 1994 job description stated that "P.A. or unlicensed physician" was "acceptable," in the 2004 description, it is listed as "desired." *Id.*, Exs. 11, 37. Plaintiff took and passed her medical boards, making her an "unlicensed physician." There is no evidence on the record that Arca-Quinto has the qualification of being an unlicensed physician. *See* Frumkin Aff., Ex. D (Arca-Quinto's resume).

On March 12, 2004, plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC), alleging discrimination on the basis of age, national origin, color, sex, and race. She was granted a right-to-sue letter. Ruderman Aff., Ex. A.

Plaintiff filed a complaint in this court against IMC, Dr. Eric Jaffe, and Ms. Kathleen Kuck on August 12, 2004, under the Age Discrimination in Employment Act, 29 U.S.C.S. § 621-34; the New York State Executive Law § 296 (Human Rights Law); and the New York City Administrative Code § 8 et seq. She amended her complaint on October 11, 2004, to include

7

claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e; and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. Defendants moved for summary judgment.

## IV. Law

### A. Standard of Review

A motion for summary judgment is appropriate when it is clear that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986). The moving party bears the burden of establishing that no genuine issue of material fact exists. Fed. R. Civ. P. 56(c). The party opposing the motion must make a showing sufficient to establish any essential element for which it will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322, 105 S. Ct. at 2552. *See also Mei-Lun Chen v. N.Y. City Transit Auth.*, 2003 U.S. Dist. LEXIS 16016, 10-11 (E.D.N.Y. 2003).

In discrimination cases, the inquiry into whether the plaintiff's age, sex, national origin, or race caused the conduct at issue often requires an assessment of individuals' motivations and state of mind. Because juries possess special advantages over judges in making this sort of assessment, discrimination cases call for a "sparing" use of summary judgment. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998); *accord Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998). Nonetheless, an employment discrimination plaintiff faced with a properly supported summary judgment motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). *See also Distasio*, 157 F.3d at 61. She must present

8

evidence sufficient to allow a reasonable jury to find in her favor. *See McCarthy v. N.Y. City Technical College*, 202 F.3d 161, 167 (2d Cir. 2000).

## B.     Employment Discrimination Law

Employment discrimination cases under the Age Discrimination in Employment Act are analyzed under the same framework as those brought pursuant to Title VII of the Civil Rights Act of 1964. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 621 (1985). *See also Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997). New York courts have consistently looked to cases applying such federal statutes as Title VII and the ADEA to inform their analysis of New York's Human Rights Law. *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180 (2d Cir. 1992). As a result, the evidentiary threshold and framework for overcoming a motion for summary judgment are the same under federal, state and city law.

Two distinct paths to a showing of employment discrimination have evolved within the case law applying Title VII and the ADEA, built on a misleading dichotomy between "direct" versus "circumstantial" evidence. At root, the operative inquiry is whether plaintiff has presented sufficient evidence to justify a jury verdict in her favor.

In order to prevail in an employment discrimination case, the plaintiff must (1) present evidence suggesting that at least part of the employment decision was made on discriminatory grounds; and (2) prove that any showing by the defendant of a legitimate reason for the decision was pretextual. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-1181 (2d Cir. 1992).

### 1. Prima Facie Evidence

The standard for presenting a prima facie case of employment discrimination involves a four-part test originally set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). The plaintiff must show:

> (i) that [s]he belongs to a racial minority; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.*

If the plaintiff succeeds in producing sufficient evidence of all four *McDonnell* factors, an assumption of discrimination is appropriate. The burden then shifts to the defendant, "to articulate some legitimate reason for the employee's rejection." *Id.* The purpose of this framework "is to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 & n. 8, 101 S. Ct. 1089, 1094-95 & n. 8 (1981).

If the defendant provides a nondiscriminatory reason for its hiring decision, the burden once more shifts to the plaintiff to prove "every element of the claim." *Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2d Cir. 1997). To prevail at this stage, the plaintiff must show (1) that the defendant's alternative explanation is merely a "pretext," defined by the United States Court of Appeals for the Second Circuit as "a proffered reason that is not credited by the finder of fact";

and (2) "that the true motive was the illegal one argued by the plaintiff." *Id.* at 1337-38. Both of these determinations are factual and must be made by a jury.

The Court of Appeals for the Second Circuit has recognized that "[i]n our diverse workplace, virtually any decision in which one employment applicant is chosen from a pool of qualified candidates will support a slew of prima facie cases of discrimination." *Id.* at 1337. The fact "that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of [discrimination] is correct." *Id.* at 1339. Even so, "[t]he fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993).

The plaintiff has met her burden when she has established grounds supporting a reasonable jury's determination that the defendant's actions were motivated by discriminatory intent.

### 2. Evidence of Overt Discrimination

In some cases, the plaintiff may seek to rely entirely on statements made by the defendant that appear to show overt discriminatory motives. The United States Court of Appeals for the Second Circuit has held that in cases in which the plaintiff offers evidence of overt discriminatory intent, "the burdens of proof outlined in *McDonnell Douglas* need not apply." *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1568 (2d Cir. 1989); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 1795 (1989) (O'Connor, J., concurring). Instead, once the plaintiff produces evidence of an overt statement of discriminatory intent, "the

11

burden falls to the defendant to prove by a preponderance of the evidence that it would have made the same decision even if it had not taken the illegitimate factor into account." *Grant*, 880 F.2d at 1568.

## V.     Application of Law to Facts

### A.     Plaintiff's Claim Regarding Her Rejection for Residency

To support her claim of age discrimination regarding Dr. Jaffe's persistent rejection of her applications for a residency position at IMC, plaintiff relies on statements evincing clear discriminatory intent, in the form of her own testimony and affidavits describing conversations between plaintiff and Dr. Osama Badran and Ms. Virginia Baron during which they related to her Dr. Jaffe's statement that he had not selected plaintiff for a residency because she was "too old." Plaintiff's testimony regarding her conversations with both Dr. Badran and Ms. Baron is admissible only if the statements about which she wishes to testify fall within the hearsay exceptions described in Rules 801(d)(2)(A) and 805 of the Federal Rules of Evidence.

Rule 805 of the Federal Rules of Evidence contemplates situations involving two or more levels of hearsay, where each is independently covered by another hearsay exception. In such situations, "[h]earsay included within hearsay is not excluded under the hearsay rule." Fed. R. Evid. 805. In order for Dr. Jaffe's alleged statements regarding plaintiff's age to be admissible under Rule 805, Dr. Badran's and Ms. Baron's statements must be excepted under another rule of evidence. In this case, plaintiff argues that they should be excepted under Rule 801.

Rule 801(d)(2)(A) of the Federal Rules of Evidence states that a "party's own statement, in either an individual or a representative capacity" is not hearsay and is therefore admissible. In this case, both Dr. Badran and Ms. Baron were employed by IMC at the time the alleged

12

statements were made. Dr. Badran was employed as the acting Chairman of Obstetrics & Gynecology and Ms. Baron was employed as the Director of Quality Assurance. Both Dr., Badran and Ms. Baron had authority over entire departments within IMC when the alleged statements were made. Such positions of authority are sufficient to allow Dr. Badran and Ms. Baron to speak in a representative capacity for IMC. *Bensen v. American Ultramar*, 1996 U.S. Dist. LEXIS 10647, *37-38 (S.D.N.Y. 1996). Any statements made by either fall within exception stated in Rule 801(d)(2)(A) and are therefore admissible.

Plaintiff has provided sufficient evidence of an overt statement of discriminatory intent to shift the burden of proof to the defendants. Any issues of credibility raised by Dr. Badran and Ms. Baron's denials that they made or heard bias comments are for the jury. Defendant has not proffered evidence sufficient to find as a matter of law that it would have made the same decision even if it had not taken the illegitimate factor into account.

Defendant's motion for summary judgment is denied with respect to plaintiff's claim regarding her rejection for a residency.

## B. Plaintiff's Claim Regarding Interfaith's Failure to Hire or Recall Her from Layoff for an Opening in the Quality Assurance Department

Plaintiff's ADEA, Title VII, and NYSHRL claims of discrimination on the basis of age and national origin by defendant's failure to rehire her for the June 2003 opening in the Quality Assurance Department rest on the criteria set forth in *McDonnell Douglas*. *See* 411 U.S. at 802, 93 S. Ct. at 1824, and discussion *supra*.

As a fifty-six-year-old native of India, plaintiff qualifies as a member of groups protected by ADEA, Title VII, and NYSHRL. Although plaintiff was not explicitly aware of the vacancy in her former department, she had written to her former supervisor the same month the job became available, expressing a desire to return to work at IMC, in the Quality Assurance department in particular. Despite the fact that she had several years of work experience in the position that had become available, IMC instead chose to hire Amy Arca-Quinto, a woman outside plaintiff's protected age class and of a different national origin. Ms. Arca-Quinto shares a country of origin – the Philippines – with both the departing and incoming department supervisors, a possible motive for the alleged discrimination.

Having at the very least advanced arguably persuasive arguments toward elimination of what the Supreme Court called "the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought," *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S. Ct. 1843, 1866 n. 44 (1977), plaintiff has met her burden under *McDonnell Douglas* of creating "an inference that the decision was a discriminatory one," *id.*, and the burden shifts to defendant to "produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094.

In order to meet its burden, "[t]he defendant's task is merely to articulate (not prove), via admissible evidence, a legitimate reason for the employment decision." *Tyler*, 958 F.2d at 1180-1181. Defendant seeks to meet this burden by arguing that its decision to hire Ms. Arca-Quinto was based on substantial changes in the job description for "Quality Assurance Assistant," making Ms. Arca-Quinto's computer and teaching skills relevant to the hiring decision. In support of its assertion, defendant supplies the deposition testimony of Kathleen

14

Kuck, former chief operating officer at IMC, *see* Kuck T. 41-44, and Noella Co, the supervisor who ultimately made the decision. Co Aff. ¶¶7-8.

Once defendant has articulated a legitimate nondiscriminatory reason for its employment decision the burden shifts back to plaintiff; plaintiff "may prevail only if [the] employer's proffered reasons are shown to be a pretext for discrimination." *Fisher*, 114 F.3d at 1339. Offered as evidence to controvert defendant's alternative explanation are the nearly identical official job descriptions for the position of Quality Assurance Assistant, one from 1994, when she was originally hired, and one from 2005. Ofodile Aff., Exs. 11, 37. See Appendices A and B. Defendant's own witness, Kathleen Kuck, testified that any change in job responsibility "would have been put in a job description." Kuck T. 44.

Plaintiff has presented evidence sufficient for a reasonable jury to find that defendant's stated motivations were pretextual, and to infer from "disbelief of the reasons put forward by the defendant[,] . . . together with the elements of the prima facie case," that defendant's hiring decision was based on "intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 511, 113 S.Ct. at 2749.

Defendant's motion for summary judgment is denied with respect to plaintiff's claim of discrimination in defendant's failure to hire her for an opening in the Quality Assurance Department.

## VI. Conclusion

Defendant's motion for summary judgment is denied as to plaintiff's claim regarding defendant's failure to rehire her for employment in the Quality Assurance Department and plaintiff's claim regarding her rejection for residency. Plaintiff has voluntarily dismissed her

claim regarding defendant's failure to hire her for the position of Assistant Vice President of Clinical Services. The complaint against Dr. Eric Jaffe and Ms. Kathleen Kuck is dismissed. The case plaintiff makes out is tenuous.

The case is set for trial on October 30, 2006. Jury selection shall, on consent, be by the Magistrate Judge.

SO ORDERED.

Jack B. Weinstein
Senior United States District

Dated: October 5 , 2006
Brooklyn, NY

# APPENDIX A

 *Appendix A*

Interfaith Medical Cent
555 Prospect Place
Brooklyn, N.Y. 11238
(718) 935-7000

POSITION: Q.A. Assistant

REPORTS TO: Q.A. Coordinator

JOB SUMMARY: Serves as liaison between hospital Quality Assessment & Improvement program and medical staff departmental peer review committee. Conducts initial medical records review for departmental Quality Assessment & Improvement indicators.

DUTIES & RESPONSIBILITIES:

1. Designs and conducts focused studies for assigned departments.

2. Attends peer review committee meetings and serves as staff support to ensure that agendas/minutes meet hospital requirements.

3. Conducts medical records review of departmental Quality Assessment & Improvement indicators, as assigned.
Summarizes data and prepares reports.

4. Conducts initial mortality review.

5. Assists the Coordinator with coordination and follow-up of IPRO & DOH responses.

6. Maintains physician practice profiles for assigned departments.

7. Assists with follow up regarding case review as identified via concurrent generic screen review.

8. Secures medical records as needed for Quality Assessment & Improvement reviews.

EDUCATION: P.A. or unlicensed physician acceptable
Undergraduate degree in health related field preferred

EXPERIENCE: Minimum of two (2) years as Medical Records Technician or Q.A. Assistant preferred.

KNOWLEDGE: Medical Terminology required. Computer literacy preferred.

PERSONAL: Must be able to maintain confidentiality and handle stressful situations, diplomacy, integrity, flexibility

St. Johns Episcopal and Brooklyn Jewish Hospitals have combined 190 years of medical care to create Brooklyn's newest medical complex

# APPENDIX B

*Appendix B*

# Interfaith

**Position:** Quality Assurance Assistant
**Supervisor:** Director, Quality Assurance
**Department:** Quality Assurance

**Job Code:** 20719
**FLSA:** Exempt
**Union Status:** Non-Union

| | | |
|---|---|---|
| **Position Summary** | To serve as a liaison between the Quality Assessment and Improvement program and medical staff departmental peer review committee. To conduct initial medical records review for departmental quality assessment and improvement indicators. | |
| **Essential Functions** | Conducts medical records review of departmental quality assessment and improvement indicators as assigned. Summarizes data and prepares reports. | 15% |
| | Assists with follow up regarding case review as identified by concurrent generic screen review and review of Quality Indicator Process. | 15% |
| | Coordinates Quality Management database for assigned medical staff departments. Presents same to Peer Review committees monthly. | 15% |
| | Designs and conducts focused studies for assigned departments. | 10% |
| | Attends peer review committee meetings. Serves as staff support to ensure that agendas / minutes meet hospital requirements. | 10% |
| | Assists medical staff in the Mortality Review Process. | 10% |
| | Assists the Director with coordination and follow up of IPRO and DOH responses. | 10% |
| | Maintains physician practice profiles for assigned departments. | 10% |
| | Secures medical records as needed for Quality Assessment and Improvement reviews. | 5% |

## Position Requirements

| | |
|---|---|
| **Minimum Knowledge** | This position requires advanced knowledge of a specialized or technical field or a thorough knowledge of the practices and techniques of a professional field. |
| **Formal Education and Job-Related Experience** | This position requires a minimum formal education of Bachelor's Degree and a minimum of 1 year job-related experience. Desired (not required) criteria include: Unlicensed physician or Physician's Assistant. BS degree should be in health related field. Minimum one year conducting audits. |
| **License, Registration, or Cert. Required** | CPHQ, QA/Utilization review cert. Preferred |
| **Comments** | |

05/17/2004